IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:21-CV-83-M

RAYMOND EARL MAY, JR. and ANGELA DOLORES MAY,

      Plaintiffs,

      v.

MARTIN FEIN INTEREST LTD., et al.,

      Defendants.

**ORDER AND MEMORANDUM AND RECOMMENDATION**

This matter is before the court on Plaintiffs' applications to proceed in forma pauperis [DE-7, -11] and for frivolity review of the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B). Plaintiffs have demonstrated appropriate evidence of inability to pay the required court costs, and the applications to proceed in forma pauperis are allowed. However, for the following reasons, it is recommended Plaintiffs' claims be dismissed in part.

## I. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1915(e)(2)(B), the court shall dismiss the complaint if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks money damages from a defendant immune from such recovery. 28 U.S.C. § 1915(e)(2)(B)(i–iii); *see Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994) (explaining Congress enacted predecessor statute 28 U.S.C. § 1915(d) "to prevent abuse of the judicial system by parties who bear none of the ordinary financial disincentives to filing meritless claims"). A case is frivolous if it lacks an arguable basis in either law or fact. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *McLean v. United States*, 566 F.3d 391, 399 (4th Cir. 2009) ("Examples of frivolous claims include those whose factual

allegations are 'so nutty,' 'delusional,' or 'wholly fanciful' as to be simply 'unbelievable.'"). A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." *Neitzke*, 490 U.S. at 327. A claim lacks an arguable basis in fact when it describes "fantastic or delusional scenarios." *Id.* at 327–28.

In determining whether a complaint is frivolous, "a court is not bound, as it usually is when making a determination based solely on the pleadings, to accept without question the truth of the Plaintiff's allegations." *Denton v. Hernandez*, 504 U.S. 25, 32 (1992). Rather, the court may find a complaint factually frivolous "when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Id.* "The word 'frivolous' is inherently elastic and not susceptible to categorical definition . . . . The term's capaciousness directs lower courts to conduct a flexible analysis, in light of the totality of the circumstances, of all factors bearing upon the frivolity of a claim." *Nagy v. Fed. Med. Ctr. Butner*, 376 F.3d 252, 256–57 (4th Cir. 2004) (some internal quotation marks omitted). In making its frivolity determination, the court may "apply common sense." *Nasim v. Warden., Md. House of Correction*, 64 F.3d 951, 954 (4th Cir. 1995).

In order to state a claim on which relief may be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level . . ." *Twombly*, 550 U.S. at 555. While a complaint need not contain detailed factual allegations, the plaintiff must allege more than labels and conclusions. *Id.*

In the present case, Plaintiffs are proceeding *pro se*, and pleadings drafted by a *pro se* litigant are held to a less stringent standard than those drafted by an attorney. *See Haines v. Kerner*,

2

404 U.S. 519, 520 (1972). This court is charged with liberally construing a pleading filed by a *pro se* litigant to allow for the development of a potentially meritorious claim. *See id; Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Noble v. Barnett*, 24 F.3d 582, 587 n.6 (4th Cir. 1994). However, the principles requiring generous construction of pro se complaints are not without limits; the district courts are not required "to conjure up questions never squarely presented to them." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

## II. ANALYSIS

The allegations of the complaint are as follows. [DE-1-1, -1-2].[1] In March 2018, Plaintiffs Angela May and Raymond May ("Ms. May" and "Mr. May") and their disabled adult daughter, Alexis Angelena Lucas ("Ms. Lucas"), who is not a plaintiff, applied for an apartment at Creekside at Crabtree ("Creekside") in Raleigh, North Carolina. *Id.* at 9. Eleven different leases were sent to Plaintiffs, and Plaintiffs allege that Defendants attempted to deter them from moving to Creekside. *Id.* Plaintiffs were initially offered several rent concessions. *Id.* Leasing agent Meredith Cicale ("Ms. Cicale") first showed Plaintiffs Apartment 331, but then informed them that it was not available. *Id.* Ms. Cicale showed them Apartment 316 and stated that she would lease it at the same rate and with the same concessions as Apartment 331. *Id.*

Plaintiffs returned the next week to sign the lease, and a different leasing agent, Lauren, showed them Apartment 237. *Id.* at 10. Again, Plaintiffs were told that they could lease Apartment 237 for the same rate as Apartment 316. *Id.* Plaintiffs asked if it was a handicapped accessible building, and the leasing agent stated that it was. *Id.* However, Apartment 237 is not a handicapped accessible apartment because a person in a wheelchair would be unable to access

---

[1] The court has set out what it perceives to be the material allegations contained in the approximately forty pages Plaintiffs have filed as part of their complaint.

several rooms. *Id.* Defendant William Hubbard, the apartment manager, informed an investigator that Apartment 237 was rented as a handicapped accessible unit. *Id.*

In April 2018, Ms. Cicale offered Plaintiffs a preferred employee discount. *Id.* Defendant Katie Nelson, an apartment manager, confirmed that Plaintiffs could receive the discount, which included no security deposit. *Id.* After ten leases were sent to Plaintiffs, the special terms were removed. *Id.* Defendant Nelson stated that she contacted Defendant Brenda Hubbard, another manager, and that Plaintiffs would only be approved for the apartment if they paid the first and second months' rent and a one thousand dollar security deposit and that the special rate would start in mid-June, the second month of the lease. *Id.*

However, Plaintiffs had to pay the full amount of rent for the month of June. *Id.* at 11. Defendant Nelson told them that some people would move into the apartment, stay for one month rent free, and then move out. *Id.* Defendant Nelson also told Plaintiffs that they could not pay rent like everyone else; they had to pay by certified funds only and could not pay using the residence portal. *Id.* Plaintiffs asked Defendant Nelson if she would honor the terms offered by Lauren, and Defendant Nelson told them that she would not and that Lauren had given them bad information. *Id.*

Around March 21, 2018,[2] Ms. Cicale told Plaintiffs that they were approved and would get certain concessions. *Id.* Afterwards, Plaintiffs were contacted by either Ms. Cicale or Defendant Desserraye Perry requesting information they had already submitted, including rental history and income verification. *Id.* Defendant Perry informed Plaintiffs that Ms. Cicale had given them bad information and that they would have to pay a one thousand dollar security deposit and the first

---

[2] In several instances, the dates in the complaint are not in chronological order. However, the *sequence* of events described in the complaint appears to be in chronological order, so the court paraphrases the events in the order in which they appear in the complaint notwithstanding the out-of-order dates.

4

month's rent, but it would be refunded in mid June. *Id.* Plaintiffs were told that they would have to pay a total of $3,090 to move in. *Id.* Plaintiffs received a Welcome Letter from Creekside stating that the move in amount would be $3,090 and that the discounts would start the second month of the lease. *Id.*

On April 6, 2018, Defendant Perry stated that Plaintiffs were approved with a one thousand dollar security deposit and a one hundred fifty dollar refundable application fee per person, and that Plaintiffs must pay in certified funds. *Id.* at 11–12.

On June 6, 2018, management placed a non-sufficient funds notice on Plaintiff's apartment door. *Id.* at 12. Plaintiffs could only pay by certified funds and could not use the residence portal, so they placed their payment in the drop box. *Id.* Defendant Nelson later stated that the money was found and that the notice was posted by mistake. *Id.* Plaintiffs allege that the notice was a way to intimate, harass, and humiliate them. *Id.*

On June 12, 2018, Defendant Nelson stated that she had to post the notice because she did not want Plaintiffs to move in for free and then move out without paying rent for two months. *Id.* Plaintiffs again asked Defendant Nelson if she would honor the terms offered by Ms. Cicale, and Defendant Nelson stated that she would not. *Id.* She again told Plaintiffs that they could not pay like everyone else and that they had to pay by certified funds. *Id.* Plaintiffs allege that those actions were to deter them from renting an apartment because of their race and disabilities. *Id.*

On July 7, 2018, Defendant Perry signed for Ms. Lucas's pain medication, and when Ms. May asked Defendant Perry if the package had arrived, Defendant Perry stated that it had not and that she had not signed for any deliveries that day. *Id.* at 13. The medication was found only after the pharmacy tracked the package. *Id.* On July 10, 2018, Ms. May received a call from Victor Rotello, a leasing agent, stating that the medication had just arrived. *Id.* Plaintiffs allege that Ms.

5

Lucas suffered in extreme pain for three days because Defendant Perry attempted to steal the medication. *Id.*

Also on July 10, 2018, Defendant Nelson for the second time sent an email to Plaintiffs stating that the Non-Sufficient Funds Notice had been placed on their door in error. *Id.* Plaintiffs allege that the Creekside staff were aware that Ms. Lucas has relapsing Multiple Sclerosis and that Mr. May has a heart condition that could be exacerbated by the placement of the notice. *Id.*

On July 14, 2018, Mr. May called 911 regarding a disturbance in Apartment 337, and the police responded. *Id.* Defendant Nelson and a maintenance worker came to Plaintiffs' apartment and told them that they were there to drill a hole in the ceiling to check the thickness of the insulation. *Id.* at 13–14. No notices were sent to Plaintiffs in violation of Creekside policy. *Id.* at 14. Defendant Nelson stated that she could not do anything about the disturbance in Apartment 337 without proof and that she had received several complaints from other residents. *Id.* Defendant Nelson stated that Plaintiffs should call maintenance or the courtesy officer living in the building instead of calling 911. *Id.* The people living in Apartment 337 were two white women. *Id.*

Also on July 14, 2018, Defendant Nelson offered Plaintiffs a one hundred fifty dollar gift card to a restaurant instead of refunding their application fee. *Id.* Plaintiffs explained to Defendant Nelson "how insulting it is to offer people of color food to smooth over a racist issue." *Id.* Defendant Nelson stated that she did not see anything wrong with what she said. *Id.* Defendant Nelson also said that if Defendant Perry made certain statements, they could not be considered racist because Defendant Perry is of mixed race. *Id.* Defendant Nelson asked what statements were made by Defendant Perry, and Plaintiffs told her that the offensive statements were that they could pay only by certified funds, could not use the residence portal to pay rent like everyone else,

6

and that the special offer would not start until the second month because some people move in for free and then move out without paying rent. *Id.* at 14–15. Then, Plaintiffs listened to a recording and realized that Defendant Nelson made the statements. *Id.* at 15. Defendant Nelson is white, and Plaintiffs allege that she thought that the statements were racist. *Id.*

On August 21, 2018, Ms. May sent an email stating that all visitors who come to see her in Apartment 237 must enter through the security gate, that all deliveries would be allowed to come to the apartment, and that no packages should be sent back. *Id.* However, Creekside staff continued to not allow deliveries and would not allow Ms. Lucas's case worker, who is black, to come to the apartment on her own, although they allowed Ms. Lucas's white nurses to come to the apartment freely. *Id.* Also on August 21, 2018, Creekside staff sent Plaintiffs an email stating that they would no longer sign for deliveries, including medication. *Id.* at 15–16.

On September 7, 2018, Kelly Medical informed Ms. May that they could not continue to send medical supplies because the packages were being returned and it was costing them too much to resend them. *Id.* at 16. On October 27, 2018, Plaintiffs had to drive two hours to pick up medical supplies because Creekside staff refused to sign for their deliveries. *Id.*

On November 15, 2018, the washer in Apartment 237 stopped working. Stephon, a leasing agent, allowed Mr. May to use a vacant apartment's washer and dryer and told him that when a washer breaks, staff would normally allow tenants to use a washer in a vacant apartment. *Id.* On November 24, 2018, Mr. May asked to use a washer in a vacant apartment again, and Stephon told him that he could not due to insurance issues. *Id.* at 16–17. Mr. May told Stephon that the door to the washer was locked, the clothes smelled of mold, and maintenance had been to the apartment twice but had not fixed the problem. *Id.* at 17. Stephon told him that a broken washer was not considered an emergency and that no one would be coming to the apartment. *Id.*

7

On December 3, 2018, Defendant Trevor Stroud sent an email stating that deliveries would not be allowed to bring packages to Plaintiffs' door without written permission, and all packages will be placed in the office. *Id.*

On January 5, 2019, Ms. May attempted to pay rent with a money order, but Defendant Kerry Allen refused to take the payment and acted as if she was going to cry for no apparent reason. *Id.*

On June 11, 2019, Plaintiffs attended a social event at Creekside, and Defendant Stroud said to them in a sarcastic and insulting tone, "How is your daughter? I have been thinking about her[.] I am sure it [is] a good walk. You have to walk back and forth every day." *Id.* at 18. The comment was in reference to Ms. Lucas's apartment being on the other side of the building from Plaintiffs' apartment. *Id.*

On March 9, 2019, Creekside staff refused to sign for Ms. Lucas's pain medication. *Id.* Defendant Stroud gave the delivery driver a key to enter the main building, but the medication was never delivered. *Id.* Mr. May went to the UPS Customer Service Department, where a manager called 911 and the police responded. *Id.* Plaintiffs allege that Creekside staff were responsible because if they had signed for the package, the police never would have been called. *Id.* at 18–19.

On April 11, 2019, Defendant Stroud called Ms. May to tell her that a Wake County Sheriff's deputy was in his office with papers for Ms. May. *Id.* at 19. Defendant Stroud accessed Ms. May's personal files, retrieved Aajalon Lucas's name, and gave the deputy Ms. May's personal information in violation of Creekside policy as well as local, state, or federal privacy policy. *Id.*

On May 1, 2019, Plaintiffs met with Defendant Brenda Hubbard and Defendant Stroud. *Id.* Defendant Brenda Hubbard asked them to turn off their phones so that she could not be

8

recorded. *Id.* Defendant Brenda Hubbard berated Plaintiffs, stated that she was sick and tired of them, and told them that Creekside staff had bent over backwards for them and that there was nothing else she could do. *Id.* Defendant Brenda Hubbard said that it would cost $4,000 for Plaintiffs to leave the apartment, and she was not worried about whether what she said was racist because she has a black husband and black children. *Id.* Plaintiffs tried to explain to Defendant Brenda Hubbard that that statement alone was racist. *Id.* at 19–20.

On May 6, 2019, Plaintiffs signed a lease for Apartments 441 and 459 with a pen and not with an electronic signature. *Id.* at 20. During later eviction proceedings, Creekside's lawyers presented leases with electronic signatures and fraudulent leases and ledgers. *Id.*

In May 2019, Defendant Stroud sent Plaintiffs a Move Out Statement with a balance transfer and various charges, and in retaliation, Creekside management sent Plaintiffs a Move Out Statement for Apartment 237 stating that they owe $114, when the latest Move Out Statement was zero. *Id.*

In June 2019, Defendant William Hubbard sent an email to all tenants stating that Defendant Invesco Ltd. is the new owner of the property and that their lease terms will not change. *Id.* at 21. However, in December 2019, Defendant Karry Allen changed Plaintiffs' lease terms. *Id.*

On June 20, 2019, Plaintiffs filed a complaint with the North Carolina Office of Administrative Hearing ("NCOAH") Civil Rights Division Human Relation Commission. *Id.* In retaliation, Defendant Karry Allen informed Plaintiffs that they had not paid the right amount of rent since singing the lease for Apartments 441 and 459. *Id.* She stated that the rent concession would not be applied to the new leases. *Id.*

9

On August 6, 2019, a Kelly Medical Supply representative asked Plaintiffs where she should send Ms. Lucas's medication because Creekside staff refused to sign for the packages. *Id.*

On August 3, 2019, Mr. May met with Defendant William Hubbard, and Defendant William Hubbard stated that Mr. May's lease was not correct. *Id.* at 22. Defendant William Hubbard later left a voicemail for Mr. May stating that it was an IT issue and that the rent concessions would be placed back on both apartments. *Id.*

On August 9, 2019, Plaintiffs received an email from an attorney stating that Creekside wanted them to leave immediately. *Id.* She did not give a reason, and Plaintiffs allege that it was a way to threaten, intimidate, harass, and humiliate them. *Id.*

On August 10, 2019, there was a leak from the washer, and it was the fourth or fifth time that maintenance had to work on the washer. *Id.* Plaintiffs allege that it was in retaliation for filing a complaint with the NCOAH. *Id.*

On September 12, 2019, an attorney emailed Plaintiffs to ask where they should put a handicapped parking sign for Ms. Lucas. *Id.* at 23. Ms. Lucas had been living at Creekside since May 2018. *Id.*

In October, Mr. May accidentally locked himself out of the grilling area and could not retrieve his food. *Id.* He called the emergency maintenance number, and personnel refused to come, so Mr. May returned to his apartment. *Id.* Ten minutes later, Raleigh police officers knocked on his door, and when he opened it, they were standing in a tactical position. *Id.* They stated that they were responding to a disturbance involving a gun and that someone was attempting to kick down a door. *Id.* They escorted Mr. May to the lobby area, and five minutes later, a maintenance person unlocked the door so that Mr. May could retrieve his food from the grill. *Id.* Defendant Nelson later sent an email explaining that she directed her team to call the police

10

because they were told that Mr. May was threatening to kick down a door to get his belongings, including a gun. *Id.* Defendant Nelson said that she had no idea why the police came to Mr. May's door and that she appreciated him being compliant. *Id.* at 24. Plaintiffs allege that it was a racist email. *Id.*

From May 2019 to December 2019, Creekside gave Plaintiffs a different amount of rent to pay each month. *Id.* The price was anything Plaintiffs wanted, from fifteen dollars up to market rate. *Id.* However, in December 2019, Defendant Allen refused to use the rent concessions on both apartments and raised the rent. *Id.* On January 5, 2020, Defendant William Hubbard stated that he will be standing by Defendant Allen's decision. *Id.* He sent an email on January 8, 2020 confirming that Plaintiffs would lose their concession and would have to pay market rate rent, and he sent fake ledgers and leases knowing the information was fraudulent and incorrect. *Id.*

On March 9, 2020, Plaintiffs sent an email to Defendant William Hubbard informing him that they would not be moving out of Creekside, but Defendant William Hubbard refused to allow them to renew their leases. *Id.* at 25. Plaintiffs allege that the refusal was in retaliation for filing a complaint against Creekside staff. *Id.*

In February 2020, Creekside filed a summary ejection action in Wake County against Plaintiffs. *Id.* The trial date was set for March 23, 2020. *Id.* On March 15, 2020, an attorney for Creekside called Plaintiffs and stated that they wanted Plaintiffs to move out, and she did not give any reasons. *Id.*

Defendant Stroud sent a Wake County deputy to Apartment 459 to serve child support papers on Plaintiffs, even though the address on the papers was for Apartment 237. *Id.* at 26. The child support documents were for Aajalon Lucas, and Defendant Stroud knew that Plaintiffs live alone in Apartment 459. *Id.*

11

On March 23, 2020, Creekside withdrew their summary ejection action and stated that it was because Governor Cooper issued a stay at home order. *Id.*

On March 31, 2020, Defendant William Hubbard posted a picture on Creekside's Facebook page in which several people display white supremacy hand signs. *Id.* On April 7, 2020, Creekside maintenance staff uploaded a video in which Defendant William Hubbard and other white men display white supremacy hand signs. *Id.* Additionally, Plaintiffs allege that Defendant William Hubbard displays white supremacy hand signs and the number eighty-eight on his personal Facebook page. *Id.* at 26–27. On Defendant Bell Partners' website, Plaintiffs allege that there are images of employees displaying white supremacy hand signs, and one woman displays the "fourteen words" hand sign. *Id.* at 27.

On April 10, 2020, Creekside's lawyer sent Plaintiffs a settlement offer to resolve the eviction proceedings. *Id.* The offer would require Plaintiffs to move out by May 2020. *Id.*

In June 2020, Defendant William Hubbard stated that signing for Ms. Lucas's medication was an administrative burden for Creekside and that they would not sign for the medication. *Id.* However, they continued to sign for other deliveries and would call tenants to inform them that packages had arrived. *Id.* at 27–28.

In July 2020, Defendant William Hubbard sent Plaintiffs an email stating that they must pay rent at the market rate or leave the property. *Id.* at 28. Plaintiffs allege that Creekside refused to renew their lease in retaliation unless Plaintiffs agreed to pay market rate rent for both apartments. *Id.*

On September 9, 2020, Defendants presented fake leases in Wake County court to have Plaintiffs evicted. *Id.* Plaintiffs allege that the NCOAH failed to properly investigate their housing discrimination claims, which constitutes extreme and outrageous conduct. *Id.* Plaintiffs further

12

allege that they were in imminent danger, lived in fear of not having a home and not being able to rent a home, and feared for the public safety. *Id.* Ms. Lucas's health deteriorated during this time. *Id.* The Wake County judge ultimately ruled in Plaintiffs' favor. *Id.* at 29. Plaintiffs allege that in the summary eviction trial, Defendants spread untrue statements and fraudulently took Plaintiffs to court. *Id.* at 29.

On December 27, 2020, Plaintiffs heard a voice outside their door yelling, "Wow, how can someone live like this?" *Id.* Plaintiffs opened the door, and Creekside maintenance staff and a black woman were standing there. *Id.* The maintenance staff tried to record Ms. May with his cell phone. *Id.* Plaintiffs state that the harassment, threats, and intimidation have not stopped. *Id.* Among other things, Plaintiffs request monetary damages of seventy five million dollars. *Id.* at 31.

## A. Racial Discrimination in Violation of the FHA

Plaintiffs allege racial discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604. Compl. [DE-1-2] at 6. Section 804 of the FHA makes it unlawful "to discriminate against any person in the terms, conditions or privileges of . . . rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin" or because of handicap. 42 U.S.C. § 3604(b), (f). To establish a claim under the Fair Housing Act, Plaintiffs must demonstrate that the housing action or practice being challenged was either motivated by a discriminatory purpose or had a discriminatory impact. *See Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018) ("an FHA claim can proceed under either a disparate-treatment or a disparate-impact theory of liability, and a plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages."); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984); *Young v. Lake Royal*

13

*Prop. Owners Ass'n*, No. 5:19-CV-483-FL, 2020 WL 6692985, at *4 (E.D.N.C. Sept. 21, 2020), *adopted by* 2020 WL 6693226 (E.D.N.C. Nov. 12, 2020) ("To proceed on a claim under 42 U.S.C. § 3604(b), a plaintiff may show either direct evidence of discrimination or may show discrimination through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)").

For corporate defendants,[3] "it is well established that the [Fair Housing] Act provides for vicarious liability," and "traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Meyer v. Holley*, 537 U.S. 280, 285 (2003); *see also United States v. Cochran*, 79 F. Supp. 3d 578, 584 (E.D.N.C. 2015) ("a theory of vicarious liability . . . is a straightforward, well-established, avenue of relief in a Fair Housing Act case"). Additionally, "compliance with the ADA and FHA . . . is 'nondelegable' in that an owner cannot 'insulate himself from liability for . . . discrimination in regard to living premises owned by him and managed for his benefit merely by relinquishing the responsibility for preventing such discrimination to another party.'" *Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 602 (4th Cir. 2010) (quoting *Walker v. Crigler*, 976 F.2d 900, 904 (4th Cir. 1992)).

For individual defendants, "[a]lthough the Fourth Circuit does not appear to have addressed the issue of whether there is individual liability under the FHA, other circuits and district courts have held that, although a supervisor generally cannot be vicariously liable for an FHA violation

---

[3] Plaintiffs allege that Defendants Martin Fein Interest Ltd., Bell Partners Inc., Invesco Ltd., and The Corporation Trust Company own the residential apartment complex at issue here. Compl. [DE-1-2] at 4. Accordingly, it is recommended that the claims discussed below be allowed to proceed against these corporate defendants at this stage, for they are vicariously liable for FHA violations as owners of the apartment complex. However, Defendants Creekside at Crabtree Apartments and Crabtree Apartments Associates II LLC are not mentioned in the complaint beyond being identified as defendants. Accordingly, it is recommended these defendants be dismissed without prejudice.

14

committed by a junior employee, the supervisor may be directly liable if she participated in the violation or ratified it." *Ellis-Barr v. CP/DB Hous. Partners XIII, L.P.*, No. 3:19-CV-464-MOC-DSC, 2020 WL 4923959, at *3 (W.D.N.C. Aug. 21, 2020). Accordingly, the individual defendants' liability turns on whether they participated in or ratified the alleged violations of the FHA.

Plaintiffs have alleged facts supporting a claim under § 3604(b), which makes it unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . ." 42 U.S.C. § 3604(b). Plaintiffs allege that Defendants Brenda Hubbard, Katie Nelson, Trevor Stroud, William Hubbard, Karry Allen, Desserraye Perry, and Meagan Dawes sent them eleven different leases in "an attempt to deter" them from moving to Creekside; stated that Plaintiffs would receive a rent concession and a preferred employee discount, then removed those terms; required them to pay the full first month of rent, despite the earlier-offered concession, because "some people would move into the apartment, stay one month rent free and move out"; did not allow Plaintiffs to use the residence portal to pay rent, but rather required them to pay in certified funds only; placed a non-sufficient funds notice on their door, then later stated it was a mistake; signed for pain medication on July 7, 2018 but did not inform Plaintiffs; told Plaintiffs that they should not call 911 regarding excessive noise from an apartment occupied by white women; gave them a restaurant gift card instead of returning their refundable application fee; would not allow Ms. Lucas's black case worker to come to the apartment but would allow her white nurses to enter; refused to sign for deliveries; failed to promptly repair a broken washer; did not allow Plaintiffs to use a washer in a vacant apartment; refused to accept a rent payment on January 5, 2019; made sarcastic and insulting remarks about the distance between Plaintiffs' apartment and Ms. Lucas's

15

apartment; read Ms. May's personal file; berated Plaintiffs during a meeting on May 1, 2019; changed the terms of their leases; had an attorney ask Plaintiffs to leave the apartment; called the police on Mr. May while he was locked out of the grilling area; and posted pictures online showing white supremacy hand signs. Compl. [DE-1-2] at 9–28.

At this stage, taking the allegations of the complaint as true, Plaintiffs have alleged sufficient facts supporting a plausible claim for discrimination in the terms, conditions, or privileges of their rental. *See* 42 U.S.C. § 3604(b). First, Plaintiffs have alleged that they were treated differently from other tenants; Defendant Nelson told Plaintiffs that they "could not pay rent like everyone else," meaning that they could not use the residence portal to pay rent and could only pay in certified funds, and that they would not receive an earlier-offered rent concession for the first month because Creekside staff feared they would stay one month rent-free and then move out. Compl. [DE-1-2] at 10–11. Defendant Nelson advised Plaintiffs not to call 911 for noise complaints against their white neighbors, but she later asked Creekside staff to call 911 when Mr. May, a black resident, was locked out of the grilling area. *Id.* at 14, 23. Defendants Perry, Stroud, and William Hubbard refused to sign for Plaintiffs' packages when "their policy at that time was to sign for packages." *Id.* at 18. Second, Plaintiffs have alleged facts supporting an intent to discriminate based on race in that Creekside staff allowed Ms. Lucas's white nurses to enter the apartment on their own but not her black case worker, Defendant Brenda Hubbard berated Plaintiffs during a meeting and said that she was not worried about whether what she said was racist, and Defendant William Hubbard displayed white supremacy hand signs on Creekside's Facebook page and his own personal Facebook page. *Id.* at 15, 19, 26–27. Accordingly, it is recommended that Plaintiff's claim under 42 U.S.C. § 3604(b) for discrimination based on race in the terms, conditions, or privileges of their rental be allowed to proceed against Defendants Martin

16

Fein Interest Ltd., Bell Partners Inc., Invesco Ltd., and The Corporation Trust Company and the following individual Defendants who allegedly participated in the violation or ratified it, *see Ellis-Barr* 2020 WL 4923959, at \*3 (W.D.N.C. Aug. 21, 2020): Brenda Hubbard, who berated Plaintiffs during a meeting; Katie Nelson, who told Plaintiffs that they "could not pay rent like everyone else," removed a rent concession, and told Plaintiffs not to call 911 for a noise complaint against their white neighbors but directed staff to call 911 when Mr. May was locked out of the grilling area; Trevor Stroud, who refused to sign for packages, accessed Ms. May's personal files, and made insulting comments to Plaintiffs at a social event; William Hubbard, who refused to renew Plaintiffs' leases or sign for their packages and displayed white supremacist hand signs; Karry Allen, who removed rent concessions, changed the terms of Plaintiffs' leases, refused to accept a payment, and refused to renew the lease; Desserraye Perry, who attempted to steal Ms. Lucas's medication; and Meagan Dawes, who refused to renew Plaintiffs' leases.

## B.      Retaliation in Violation of the FHA

Plaintiffs also allege a claim for retaliation. Compl. [DE-1-2] at 7. "To state a claim for retaliation under 42 U.S.C. § 3617, Plaintiffs must allege facts to support findings that (1) they engaged in protected activity; (2) Defendants were aware of that activity; (3) Defendants took adverse action against them; and (4) 'a causal connection existed between the protected activity and the asserted adverse action.'" *Young,* 2020 WL 6692985, at \*4 (quoting *Hall v. Greystar Mgmt. Servs., L.P.*, 637 F. App'x 93, 98 (4th Cir. 2016)), *adopted by* 2020 WL 6693226 (E.D.N.C. Nov. 12, 2020).

First, Plaintiffs have alleged that they engaged in a protected activity. "Protected activity includes any 'action taken to protest or oppose statutorily prohibited discrimination' or 'the exercise or enjoyment of rights under 42 U.S.C. § 3604 to equal services and conditions of

17

housing.'" *Tigress Sydney Acute McDaniel v. VTT Mgmt., Inc.*, No. 316CV00826RJCDSC, 2018 WL 4494985, at \*3 (W.D.N.C. Sept. 18, 2018) (quoting *Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 442 (E.D. Va. 2011), *aff'd in part, vacated in part* 468 F. App'x 283 (4th Cir. 2012)), *aff'd*, 748 F. App'x 563 (4th Cir. 2019). Plaintiffs allege that on June 20, 2019, they "filed a complaint with the State of North Carolina Office of Administrative Hearing Civil [R]ights Division Human Relation Commission (H.U.D.) located in Wake County, Raleigh North Carolina." Compl. [DE-1-2] at 21. The filing of the complaint was an action taken to protest or oppose statutorily prohibited discrimination and is therefore a protected activity within the meaning of the FHA. *See Hall*, 637 F. App'x at 98 ("Hall did allege that she engaged in protected activity when she filed a HUD complaint"); *Matarese*, 795 F. Supp. 2d at 443 (finding that filing discrimination complaints with administrative agencies was a protected activity).

Second, Plaintiffs allege that Defendants were aware of that activity. Plaintiffs state that Defendant William Hubbard spoke to Jaquis Chappell, an investigator for the North Carolina Office of Administrative Hearing, about whether Apartment 237 is handicap accessible and why Creekside staff would not sign for Ms. Lucas's medication deliveries, and that Creekside staff told Investigator Chappell that they withdrew the summary ejection action because of the Covid-19 stay at home order. Compl. [DE-1-2] at 10, 26–27. In alleging that Creekside staff participated in the investigation, Plaintiffs have alleged that they were aware of it.

Third, Plaintiffs have alleged that Defendants took adverse action against them. Plaintiffs state that in retaliation for filing their complaint, Defendant Allen removed the rent concession and told Plaintiffs that they had not paid the current amount of rent. Compl. [DE-1-2] at 21. Plaintiffs also allege the following:

18

> Friday July 31, 2020 William Hubbard sent Raymond and Angela May an email stating that we must agree to pay rent at market rate and pay past due rent at market rate or leave the property. This was a day after Investigator Jaquis Chappell ended her housing discrimination investigation against Creekside at Crabtree Apartment staff. Neither William Hubbard [n]or Karry Allen, after several request[s] for a new lease prior to the end of both leases, would not renew our lease unless we agreed to pay market rate rent for both apartments. In retaliation they refused to renew our lease.

*Id.* at 28.

Offering to renew a lease at market rate rent is likely not an adverse action. *See Matarese*, 795 F. Supp. 2d at 442 (finding that "increasing Plaintiffs' and Ms. Bauman's rent by *exorbitant* rates" (emphasis added) was an adverse action). However, Plaintiffs allege in several instances that Defendants Allen and William Hubbard refused to renew their leases, and it is not clear whether Plaintiffs meant that Defendants refused to renew the leases at all or whether they refused to renew them unless Plaintiffs paid market rate rent. For example, Plaintiffs allege in one instance that Defendants Allen and William Hubbard "would not renew our lease unless we agreed to pay market rate rent," and in the same paragraph, Plaintiffs state without qualification that "they refused to renew our lease." Compl. [DE-1-2] at 28. Plaintiffs further allege without qualification that Defendants William Hubbard, Allen, and Dawes "refused to issue us a new lease. Even after several request to renew the lease for apartment 441 and apartment 459," and "Will [Hubbard] refused to allow us to sign a new lease. This was done in retaliation of filing a complaint against Creekside at Crabtree Apartments and it's [sic] staff." *Id.* at 25, 28. Accordingly, it is unclear whether Plaintiffs meant to allege that Defendants Allen, William Hubbard, and Dawes refused to renew the leases outright or whether they refused to renew them unless Plaintiffs paid market rate rent. Reading the complaint liberally and taking the allegations of the complaint as true, because

19

Plaintiffs have alleged without qualification that Defendants Allen, William Hubbard, and Dawes refused to renew their leases, they have sufficiently alleged an adverse action.

Additionally, even if Plaintiffs do not allege that Defendants outright refused to renew their leases, Plaintiffs have also alleged that Defendants Allen and William Hubbard removed the previously-applied rent concession and required them to pay all past-due rent at market rate. Compl. [DE-1-2] at 28. Changing the terms of a lease may constitute an adverse action. *Rhodes v. Parklane Apartments, LLC*, No. 8:19-CV-01463-PX, 2019 WL 7293398, at \*4 (D. Md. Dec. 27, 2019) ("Raising a tenant's rent—particularly to the point where the tenant must move—may constitute a retaliatory adverse action that gives rise to relief"). Accordingly, Plaintiffs have plead sufficient facts to support the third element of their retaliation claim.

Fourth, Plaintiffs have alleged that a causal connection exists between their protected activity and the adverse action. Plaintiffs allege that they filed a complaint on June 20, 2019, and in the same paragraph, Plaintiffs state that Defendant Allen removed their rent concession in retaliation. Compl. [DE-1-2] at 21. Plaintiffs also allege that one day after the housing investigation ended, Defendant William Hubbard informed Plaintiffs that they must pay rent at market rate, pay past due rent at market rate despite the earlier-applied concession, or leave the property. Compl. [DE-1-2] at 28. The close temporal connection between the investigation and the refusal to renew the lease or the removal of the earlier-applied rent concession is sufficient to plead a causal connection. *See Stokes v. Benham*, No. 3:14-CV-536-JAG, 2015 WL 4139274, at \*7 (E.D. Va. July 8, 2015), *aff'd*, 626 F. App'x 431 (4th Cir. 2015) ("Plaintiffs usually clear [the causal connection] bar easily when the protected activity and the adverse action are close together in time."). Accordingly, Plaintiffs have stated a claim for retaliation under the FHA, and it is recommended that the claim be allowed to proceed against Defendants Martin Fein Interest Ltd.,

20

Bell Partners Inc., Invesco Ltd., and The Corporation Trust Company as well as Defendants Karry Allen and William Hubbard, who removed rent concessions and refused to renew Plaintiffs' leases, and Defendant Meagan Dawes, who refused to renew the leases.

## C. Disability Discrimination in Violation of the ADA

Plaintiffs state that this court has jurisdiction over this action pursuant to the ADA, among other statutes, and that they assert a cause of action for a violation of the ADA. Compl. [DE-1-2] at 3, 6. "To state a claim under Title III of the ADA, a plaintiff must allege: (1) that she is disabled within the meaning of the ADA; (2) that defendant owns, leases, or operated a place of public accommodation; and (3) defendant discriminated against her by denying her a full and equal opportunity to enjoy services provided at such place of public accommodation." *Carter v. LCA Overlooke at Simms Creek, LP*, No. 5:18-CV-81-D, 2018 WL 2771556, at *2 (E.D.N.C. May 3, 2018) (citing 42 U.S.C. § 12182(a)), *adopted by* 2018 WL 2768671 (E.D.N.C. June 7, 2018).

First, Plaintiffs have failed to allege that either of them is disabled within the meaning of the ADA. The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiffs allege that Mr. May and Ms. Lucas, who is not a plaintiff, "are both disabled according to the Americans with Disabilities Act." Compl. [DE-1-2] at 3. Plaintiffs also allege that Mr. May has a heart condition. *Id.* at 13. Nothing further is alleged regarding Mr. May's disability; he has not alleged how his heart condition substantially limits a major life activity, that he has a record of such an impairment, or that Defendants regarded him as having such an impairment. The bare allegation that Mr. May has a heart condition is insufficient to show that he is disabled within the meaning of the ADA. *See Okyere v. John Bean Techs. Corp.*, No. 5:20-CV-190-FL, 2020 WL 7625237, at *7 (E.D.N.C.

21

Dec. 22, 2020) ("Plaintiff's bare assertions, without supporting facts, that his injury disabled him and that he is disabled within the meaning of the ADA are not adequate, as they are merely legal conclusions."); *Zelaya Sorto v. Doe*, No. 5:18-CT-3242-FL, 2020 WL 5709249, at \*6 (E.D.N.C. Sept. 24, 2020) (finding that the plaintiff failed to state a claim when he failed "to allege any facts suggesting his hearing impairment substantially limits one or more major life activities, or that prison officials regard him as disabled.").

Second, Plaintiffs have failed to allege that Defendants own, lease, or operate a place of public accommodation. Plaintiffs state that Creekside is a residential apartment complex; accordingly, it is not a public accommodation within the meaning of the ADA. *See* 42 U.S.C. § 12181(7) (listing places that are public accommodations and omitting residential housing); *Hanks v. Tilley*, No. 1:98CV00789, 1999 WL 1068484, at \*2 (M.D.N.C. Feb. 2, 1999) ("Residential facilities do not fall within the meaning of public accommodation."); *Worthington v. Golden Oaks Apartments*, No. 3:11-CV-223 RM, 2011 WL 4729879, at \*8 (N.D. Ind. Oct. 4, 2011) (collecting cases). Because Plaintiffs have not alleged sufficient facts showing that they have disabilities within the meaning of the ADA or that Defendants own, lease, or operate a place of public accommodation, it is recommended that Plaintiffs' ADA discrimination claim be dismissed.

## D.    Disability Discrimination in Violation of the FHA

Plaintiffs also allege disability discrimination in violation of the FHA. The FHA makes it unlawful:

> To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—
>
> (A) that person; or

22

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that person.

42 U.S.C. § 3604(f)(2). Additionally, "[t]o survive a motion to dismiss an FHA discrimination claim, a plaintiff must plead facts that demonstrate a sufficient nexus between the alleged disability and discriminatory act." *Fedynich v. Lozano*, No. 3:20CV260, 2021 WL 710368, at *7 (E.D. Va. Feb. 23, 2021).

Like the ADA, the FHA defines "handicap" as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602. As discussed above, neither Plaintiff has alleged that they suffer from an impairment that substantially limits a major life activity. However, unlike the ADA, the FHA prohibits discrimination because of a handicap of a person residing in the dwelling. *Id.* Plaintiffs allege that Ms. Lucas resided in an apartment that Plaintiffs rented, and the complaint states that Ms. Lucas has relapsing Multiple Sclerosis, suffers in extreme pain if she does not take specialized medication, has nurses and a case worker that come to the apartment, needs daily assistance, requires a handicapped parking sign, and is on a fixed income. Compl. [DE-1-2] at 13–15, 18, 23–24. Ms. May also alleges in her IFP application that she works as a "caregiver for Alexis, who need[s] someone with her most of the time," and Mr. May assists with Ms. Lucas's bills. [DE-11] at 6. At this stage, taking the allegations of the complaint as true, Plaintiffs have alleged that Ms. Lucas is handicapped within the meaning of the FHA and that she is a person residing in the dwelling.

Plaintiffs allege that Creekside staff discriminated against them by refusing to sign for Ms. Lucas's pain medication deliveries. Compl. [DE-1-2] at 16. The complaint alleges that on August

23

21, 2018, Creekside staff sent Plaintiffs an email stating that they would no longer sign for deliveries, including the medication. *Id.* at 15–16. Plaintiffs had to drive two hours to pick up the medical supplies on one occasion. *Id.* at 16. On another occasion, Creekside staff refused to sign for the medication, and Defendant Stroud gave the UPS delivery driver a key fob to enter the main building to deliver the medication. *Id.* at 18. For reasons unspecified in the complaint, the medication was not delivered, Mr. May went to the UPS Customer Service Department, and a UPS manager called 911. *Id.* Plaintiffs state that no one at Creekside would sign for the medication, even though their policy at the time was to sign for packages. *Id.* Plaintiffs further allege that in June 2020, Defendant William Hubbard stated that signing for the medical deliveries was an administrative burden for Creekside staff, but they continued to sign for deliveries for other tenants. *Id.* at 27–28.

Taking the allegations of the complaint as true, Plaintiffs have stated a claim for disability discrimination under the FHA. Plaintiffs allege that they were treated differently from other tenants because Creekside staff refused to sign for Plaintiffs' deliveries even though their policy was to do so and they did so for other tenants. Additionally, there is a nexus between the discriminatory act—refusing to sign for packages—and Ms. Lucas's disability because the deliveries at issue were her medical supplies, and Defendant William Hubbard stated that signing for the medical deliveries was an administrative burden. Accordingly, at this stage of the proceedings, Plaintiffs have stated a claim for disability discrimination in violation of the FHA, and it is recommended that the claim be allowed to proceed against Defendants Martin Fein Interest Ltd., Bell Partners Inc., Invesco Ltd., and The Corporation Trust Company as well as Defendant Desserraye Perry, who attempted to steal Ms. Lucas's medication, and Defendants Trevor Stroud and William Hubbard, who refused to sign for the packages.

24

**E.     Intentional Infliction of Emotional Distress**

Plaintiffs assert a claim for intentional infliction of emotional distress.  Compl. [DE-1-2] at 6.  To state a claim for intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct by the defendants (2) which is intended to and does in fact cause (3) severe emotional distress.  *Russ v. Causey*, 732 F. Supp. 2d 589, 607 (E.D.N.C. 2010) (citing *Holloway v. Wachovia Bank & Trust Co.*, 339 N.C. 338, 351, 452 S.E.2d 233, 240 (1994)).  Extreme and outrageous conduct is shown by conduct which shocks the conscience or "exceeds all bounds of decency tolerated by society." *West v. King's Dep't Store, Inc.*, 321 N.C. 698, 704, 365 S.E.2d 621, 625 (1988); *see also Ennett v. Cumberland Cnty. Bd. of Educ.*, 698 F. Supp. 2d 557, 560 (E.D.N.C. 2010) ("Conduct supporting negligent or intentional infliction of emotional distress must 'be regarded as atrocious, and utterly intolerable in a civilized society.'" (quoting *Wagoner v. Elkin City Schools Bd. of Educ.*, 113 N.C. App. 579, 440 S.E.2d 119, 123 (1994))).  A plaintiff must also allege severe emotional distress, which "means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Johnson*, 327 N.C. at 304, 395 S.E.2d at 97.

Plaintiffs have not plausibly alleged that they suffered from severe emotional distress caused by Defendants' conduct.  Plaintiffs state that Creekside's staff placed Plaintiffs "in imminent danger and caused them to be in fear of not having a home, not being able to rent a home, and fear for our public safety being [that] staff have access to our apartments and not knowing what the next day [would bring]." Compl. [DE-1-2] at 28.  Plaintiffs allege that they were always "on edge" and that Ms. Lucas's health began to deteriorate. *Id.* at 29.  The alleged actions taken by Defendants include removing previously-offered rent concessions, failing to promptly repair a

25

washer, requiring Plaintiffs to pay by certified funds only and not through the tenants' portal, placing a non-sufficient funds notice on Plaintiffs' door in error, refusing to sign for packages, giving a Wake County deputy Ms. May's information, calling the police when Mr. May was locked out of the grilling area, filing a summary ejection action, having an attorney tell Plaintiffs that Creekside staff wanted Plaintiffs to move out, and refusing to renew Plaintiffs' leases unless they paid market rate rent. Plaintiffs also allege that in a meeting, Defendant Brenda Hubbard berated Plaintiffs, stated that she was sick and tired of them, and told them that Creekside staff had bent over backwards for them and that there was nothing else she could do. *Id.* at 19. On another occasion, a maintenance worker stood outside Plaintiffs' door, said "wow, how can someone live like this," and recorded Ms. May with his cell phone. *Id.* at 29. Those allegations do not plausibly rise to the level of threats causing Plaintiffs to fear for their physical safety, and Plaintiffs do not allege that they suffered from any emotional or mental disorder which could be diagnosed by a professional. Accordingly, Plaintiffs have failed to allege severe emotional distress, and it is recommended that the claim be dismissed.

### III. CONCLUSION

For the reasons stated herein, Plaintiff's application to proceed *in forma pauperis* is ALLOWED, and it is RECOMMENDED that:

1. Plaintiffs' ADA claim and intentional infliction of emotional distress claim be DISMISSED as to all Defendants;

2. All claims against Defendants Creekside at Crabtree Apartments and Crabtree Apartments Associates II LLC be DISMISSED without prejudice;

3. Plaintiffs' FHA claim for racial discrimination be allowed to proceed against Defendants Martin Fein Interest Ltd., Bell Partners Inc., Invesco Ltd., The Corporation Trust Company,

26

Brenda Hubbard, Katie Nelson, Trevor Stroud, William Hubbard, Karry Allen, Desserraye Perry, and Meagan Dawes;

4. Plaintiffs' FHA claim for retaliation be allowed to proceed against Defendants Martin Fein Interest Ltd., Bell Partners Inc., Invesco Ltd., The Corporation Trust Company, Karry Allen, William Hubbard, and Meagan Dawes;

5. Plaintiffs' FHA claim for disability discrimination be allowed to proceed against Defendants Martin Fein Interest Ltd., Bell Partners Inc., Invesco Ltd., The Corporation Trust Company, Desserraye Perry, Trevor Stroud, and William Hubbard.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on Plaintiff. You shall have until **June 30, 2021**, to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If you do not file written objections to the Memorandum and Recommendation (M&R) by the foregoing deadline, you will be giving up the right to review of the M&R by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the M&R without such review. In addition, your failure to file written objections by the foregoing deadline will bar you from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the M&R.** *See Wright v. Collins*, **766 F.2d 841, 846–47 (4th Cir. 1985).**

27

Submitted, this the 16th day of June, 2021.

Robert B. Jones, Jr.
United States Magistrate Judge

28